IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

| | |
|---|---|
| ROBERT J. GARLAND, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No: |
| FORD MOTOR COMPANY, INC., | ) |
| Defendant. | ) |

## COMPLAINT

Comes now, Plaintiff, Robert J. Garland and, for his Complaint against Defendant, alleges and avers as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Robert J. Garland is a citizen of the State of Tennessee, and owned Heritage Ford-Lincoln-Mercury, Inc., located at 1115 and 1117 E. Spring Street, Cookeville, Tennessee, 38501 from June 1981 through October 2000.

2. Defendant Ford Motor Company, Inc. ("Ford") is an automobile manufacturer and sales corporation incorporated under the laws of the State of Delaware with its principal place of business in Dearborn, Michigan. Ford is licensed to conduct business in the State of Tennessee and may be lawfully served with process upon its registered agent, CT Corporation System, 800 S. Gay Street, Suite 2021, Knoxville, TN 37929-9710.

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because plaintiff and defendant are citizens of different states and the matter in controversy exceeds $75,000, excluding interests and costs.

4. This Court has personal jurisdiction over Ford Motor Company because Ford Motor Company conducts business in the State of Tennessee and within this district, and the cause of action arose in Putnam County, Tennessee.

5. Venue is proper with this Court under 28 U.S.C. §§ 1391(b)(2).

## FACTS

6. Until late 2000, Mr. Garland owned: (a) the capital stock in Heritage Ford-Lincoln-Mercury, Inc. ("Heritage"); (b) the property at 1115 E. Spring in Cookeville, Tennessee; and (c) a 1/10th undivided interest in 1117 E. Spring where Heritage was located (collectively, the "Dealership Property").

7. Mr. Garland was approached by Ford in 2000 with a request to buy his dealership and lease the real property. Mr. Garland was initially reluctant to sell his dealership and lease his property, but ultimately agreed, when Ford agreed to certain assurances as detailed below.

8. In or about October 2000, Mr. Garland sold all his stock and ownership interest in Heritage to Cookeville Automotive, Inc., which thereby acquired the car dealership. Ford was the majority owner of Cookeville Automotive, Inc., in October 2000. As part of the same transaction Cookeville Automotive, Inc. also bought the real property upon which the dealership is located at 1115 and 1117 E. Spring Street, Cookeville, Tennessee 38501. As part of the consideration for this sale, Mr. Garland entered into a Non-Competition Agreement with Cookeville Automotive, Inc.

9. The transaction was completed through Ford's Dealership Development Program ("DDP"). This program was started in 1950 as a means to help undercapitalized individuals become Ford dealers. Under this program, Ford provided partial capitalization for potential new dealers, and helped fund their purchase of an existing dealership. As these new dealers

successfully progressed, they bought out Ford's interest, and gained sole ownership of the dealership.

10. In or around 1999, Ford started using its DDP to increase the number of minority owners of Ford Dealerships.

11. Mr. Tom Dorsey, the DDP's southeastern regional manager in 2000, approached Mr. Garland to find out if he was interested in selling his dealership to Ford so it could install a new dealer. As Mr. Garland himself was a successful DDP alumnus, Mr. Dorsey viewed his Cookeville dealership, Heritage, as a viable candidate for a new minority dealer to purchase through the DDP.

12. Utilizing its DDP, Ford formed and became the majority owner of Cookeville Automotive, with Jamie Vergara, (of Peruvian ethnicity and the intended new owner) a minority participant with a minority ownership in Cookeville Automotive. Ford was the majority and controlling owner of Cookeville Automotive at the time of the purchase of the dealership from Mr. Garland and when the Non-Competition Agreement was made.

13. On October 1, 2000, Cookeville Automotive purchased all the capital stock of Heritage from Mr. Garland, as well as the real estate occupied by the dealership.

14. When purchasing a dealership, Ford typically did not purchase the real estate upon which the dealership was located. Instead, Ford preferred that the dealership rent its real property.

15. Accordingly, the purchase price and pay-out schedule for the real property (including fixtures) was structured as a 20 year amortized pay-out calculated as the real estate value with interest at approximately 9.3104% for the 20 year term; and this pay-out obligation was placed in the Non-Competition Agreement to satisfy partially Ford's preference for leasing

3

Case 2:12-cv-00121   Document 1   Filed 12/28/12   Page 3 of 9 PageID #: 3

and approximate the tax effect to Cookeville Automotive, Inc., had it rented the Dealership Property instead of purchasing it. Mr. Garland took a Deed of Trust to secure the indebtedness.

16. Because the purchase was to be paid out over 20 years, it was critical that Mr. Garland have a security and assurance for at least fifteen (15) years that the dealership would remain on the property.

17. Accordingly, as a part of this sale and to provide Mr. Garland sustainable financial assurance from Ford Motor Company, Ford represented and agreed that "[Ford] intend[s] to have a dealer at the [Dealership Property] for the 15 year period commencing October 1, 2000." (Exhibit A, Letter from Ford).

18. Both verbally and in its letter of October 1, 2000 (Exhibit A) Ford guaranteed that it would maintain a dealership at the Dealership Property for the remainder of the fifteen (15) year period in the event that Jamie Vergara/Heritage failed.

19. Specifically, Ford "…would require, as a condition to execution of a Sales Agreement with the replacement dealer, that he/she lease the mortgaged facility during the remainder of the 15 year period for a rental equal to the debt service then payable under the mortgage as amended or renewed with Ford Credit." (Exhibit A).

20. Further, Ford made numerous representations and promises to Mr. Garland that Ford or its dealer would lease the Dealership Property for fifteen (15) years, and would require any replacement dealer to lease the Dealership Property for the remainder of the fifteen (15) year period.

21. These representations and promises were designed to, and did, induce Mr. Garland to sell his dealership and to provide a pay-out method over time similar to a lease with

respect to the Dealership Property, by accepting a structured payment over 20 years and transferring title to the property at closing.

22. In reliance on these representations and promises, Mr. Garland proceeded with the sale of his dealership and the sale of the Dealership Property on the assurance by Ford that a dealer would remain on the Dealership Property for at least 15 years.

23. Ford made this promise to guarantee dealer occupancy and payment on the Dealership Property to Mr. Garland, and Mr. Garland reasonably relied on this promise.

24. Ford knew or should have known that Mr. Garland would rely on its guarantee, and would not have sold his dealership or property to Ford without this guaranteed assurance of dealer occupancy and payment.

25. Mr. Garland held a valid, first-priority deed of trust on the 1115 E. Spring Street property and on an undivided 1/10 interest in the 1117 E. Spring Street property.

26. At the close of Mr. Garland's sale on October 1, 2000, Heritage owed Mr. Garland the principal amount of $2,800,000, plus interest. This obligation was contained in the Non-Competition Agreement. As specified in paragraph 4 of that Agreement, this amount is payable in monthly installments of principal and interest in the amount of $25,645.00 for a period of 20 years. Additionally, Heritage owed Mr. Garland a Premium Payment of $20,000 for each year that there remained any unpaid portion of this amount. This Payment Premium is to be paid in part by monthly payments of $855.00, with the shortfall paid as a lump sum with the final monthly payment. The total payments, therefore, were $26,500 per month for 243 months, inclusive of interest and the monthly portion of the Premium Payment.

27. Ford and Cookeville Automotive complied with this Agreement until late 2008.

28. By October 2008, Mr. Vergara and Heritage had become unsuccessful, and filed bankruptcy.

29. Between the closing of the sale in 2000 and Heritage's bankruptcy filing, Heritage made 95 payments to Mr. Garland.

30. As a result of this bankruptcy, the lease payments on the Dealership Property ceased with the October 2008 payment.

31. Shortly after the bankruptcy, Ford sold the dealership rights in Heritage to a replacement dealer.

32. However, in violation of the Agreement and its various representations and promises, Ford did not require the replacement dealer to lease the Dealership Property for the remainder of the fifteen (15) year period.

33. Instead, Ford allowed the replacement dealer to relocate to a new address.

34. The effect of this move was to drastically reduce the value of the Dealership Property to a point where its fair market value was far less than the amount owed to Mr. Garland.

35. Mr. Garland suffered substantial economic loss when Ford breached its agreement and failed to require its replacement dealer to remain on the Dealership Property and to assume the payments due to Mr. Garland.

36. Mr. Garland's original agreement to sell his dealership and to be paid over time for the Dealership Property by Cookeville Automotive benefited Ford by providing it a functional and fully constructed dealership complete with a comprehensive service center.

37. Indeed, Mr. Garland would not have sold Heritage absent Ford's agreement on the terms outlined above.

38. Ford accepted the benefit of the sale by installing a new dealer, Mr. Vergara, who was able to use the already completed dealership and comprehensive service center in exchange for Ford's promise to maintain a dealership on the property for 15 years.

39. To no avail, Mr. Garland has requested that Ford appoint a replacement dealer, or pay him the money that he lost by Ford's breach.

## COUNT 1: BREACH OF CONTRACT

40. The forgoing allegations are incorporated herein by reference as if fully set forth below.

41. There is a valid and existing agreement between Mr. Garland and Ford.

42. Pursuant to the terms of the agreement, Ford is obligated to require any replacement dealer to lease the Dealership Property through October 1, 2015.

43. Ford's failure to require its replacement dealer to lease the property through October 1, 2015 constitutes a breach of this Agreement.

44. As a direct and proximate result of Ford's breach of the Agreement, Mr. Garland has incurred a substantial economic loss.

## COUNT 2: PROMISSORY ESTOPPEL

45. All the preceding allegations are incorporated herein by reference.

46. Ford made a clear, unambiguous promise that it would require a replacement dealer to lease the Dealership Property from October 1, 2000, to October 1, 2015.

47. Ford knew, reasonably expected and/or should have reasonably expected that Mr. Garland would rely upon its representations and promises, and that these representations and promises would induce action or forbearance by Mr. Garland.

48. Mr. Garland did reasonably rely upon Ford's representations and promises and such did induce him to sell his Dealership, sell his Dealership Property, and provide 100% financing on the deal.

49. As a direct and proximate result of Ford's failure to require its replacement dealer to lease the Dealership Property through October 1, 2015, Mr. Garland suffered substantial economic loss.

50. The substantial economic loss to Mr. Garland was foreseeable to Ford.

51. Mr. Garland acted reasonably in justified reliance on the promise as made.

### COUNT 3: UNJUST ENRICHMENT

52. All the preceding allegations are incorporated herein by reference.

53. Mr. Garland conferred a benefit upon Ford by selling Heritage to Cookeville Automotive

54. Ford appreciated and took advantage of that benefit by installing a new dealer, Mr. Vergara, of its choosing.

55. Ford's acceptance of this benefit under the circumstances would be inequitable for Ford to retain without payment for the value thereof.

56. Mr. Garland has exhausted all remedies against Ford Motor Company in an attempt to recover the value he is owed, and seeking any other remedy would be futile.

Wherefore, plaintiff demands a judgment against Ford Motor Company in the amount of $2,500,000.00, or such amount as may be shown at trial, together with pre-judgment interest, attorney's fees as provided in the relevant agreements, and the costs of this cause.

/s/Robert J. Walker
Robert J. Walker (#2498)
Jason W. Callen (#26225)
D. Gilbert Schuette (#30336)
WALKER, TIPPS & MALONE, PLC
2300 One Nashville Place
150 Fourth Avenue, North
Nashville, TN 37219-2424
(615) 313-6000

*Attorneys for Robert J. Garland*