# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NORTHEASTERN DIVISION

| | |
|---|---|
| ROBERT J. GARLAND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:12-00121 |
| ) | Judge Sharp |
| FORD MOTOR COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the Court is Defendant Ford Motor Company's Motion to Disqualify Plaintiff's Counsel (Docket No. 100), to which Plaintiff Robert J. Garland has filed a response in opposition (Docket No. 103), and Defendant has replied (Docket No. 114). On March 3, 2015, the Court held an evidentiary hearing on the Motion to Disqualify. For the reasons that follow, the Court will exercise its discretion and deny Defendant's Motion.

## I. FACTS

Based on a review of the record and the testimony at the evidentiary hearing, the Court finds the following to be the relevant facts:

1. This litigation involves Plaintiff's sale of Heritage Ford-Lincoln-Mercury, Inc., and the lease of the land on which it was located, to Ford through its Dealer Development Program.[1]

2. Plaintiff is represented by attorneys Robert J. Walker, Jason W. Cullen, and D. Gilbert Schuette, who previously worked for the law firm Walker, Tipps & Malone, PLC in Nashville,

---

[1] For ease of reference, the matter herein will be referred to simply as Garland or the Garland case or matter.

1

Tennessee. On February 9, 2015, those lawyer and ten others joined the law firm Butler Snow LLP.

3. Butler Snow's main office is in Jackson, Mississippi. It has numerous other offices around the United States, and the addition of the Walker Tipps lawyers increased its presence in Nashville.

4. For the past twelve years, Butler Snow has done work for Ford in Mississippi and has been paid approximately $1.3 million. The vast majority of the work has dealt with consumer and warranty matters for which Butler Snow was paid pursuant to a flat-fee retainer agreement that was renegotiated every year. As the number of consumer cases has decreased in Mississippi, the flat fee has likewise decreased, ranging from a high of $125,000 to $25,000 in 2014.

5. In September 2014, Richard M. Dye, a partner at Butler Snow and practice group leader of the firm's general litigation practice, emailed Ford stating that it would need to increase its retainer for the consumer cases in 2015. After some discussion, Ford agreed to pay Butler Snow $36,000 ($3,000 monthly) for the anticipated work in 2015, along with a $10,000 bonus to cover the unanticipated increase in work in 2014.

6. On rare occasions, perhaps twice in the last three years, Butler Snow has been enlisted to perform non-consumer, non-warranty work for Ford. Ford was separately billed for those matters.

7. Given its relationship with Ford, the lawyers at Butler Snow have come to know various lawyers and paralegals at Ford and have a general understanding of how Ford handles certain matters, including how it defends its warranty cases and the uniform approach it takes to discovery requests.

8. At the time the Walker Tipps lawyers joined Butler Snow, the latter was handling the following cases for Ford:

  Watson Quality Ford v. Forest River, et al., Hinds County Circuit Court, No. 25112114CIV;

  Edmond Lindsey v. Ford Motor Company, DeSoto County Circuit Court, No. CV2012247RCD;

  T&T Welding, Inc. v. Ford Motor Company, Smith County Circuit Court, No. 2013199;

  George Sullivan v. Ford Motor Company, Mississippi Court of Appeals, Smith County Circuit Court, No. 2014150;

  Gabriel Marcus Shemper v. Ford Motor Company, Perry County Circuit Court, No. 20140073;

  Gary Goff v. Ford Motor Company, Jackson County Circuit Court, No. CO201420684.

All of the cases were filed in Mississippi, and five of the cases were being handled by Mr. Dye and involved consumer warranty claims brought by purchasers of Ford vehicles. The sole exception, Watson Quality Ford, involved a third party subpoena *duces tecum* issued by Carpenter Bus, LLC in a dealership suit in which Ford is not a party. That case was handled by Phil B. Abernethy, another Butler Snow partner.

  9. Preliminary discussions about the possibility of the Walker Tipps lawyers joining Butler Snow began in the spring of 2014. Those discussions picked up that summer and, by late November or early December, the discussions became serious.

  10. On December 5, 2014, the partners at Walker Tipps authorized the firm to engage in negotiations which would allow the its lawyers to join Butler Snow's Nashville office.

  11. Butler Snow's standard practice in identifying conflicts or potential conflicts is to refrain from requesting information about client representation until the negotiations are far enough along that it appears the lawyers in question will likely be joining the practice. This is done in an effort

to ensure that a client's confidentiality is not unnecessarily breached by premature disclosure. In accordance with that procedure, Butler Snow first learned of Walker Tipps' clients and adverse parties on December 8, 2014.

12. Kimberly Davis, a lawyer in Butler Snow's general counsel office is responsible for processing conflict and client information. However, due to illness and the holidays, she was unable to process and complete Walker Tipps' information until January 9, 2015.

13. That same day, she forwarded the information to several lawyers, including Gayle Malone and Joe Welborn, the two partners at Walker Tipps who were designated to deal with Butler Snow in addressing any potential conflicts which had been identified. Ms. Davis also forwarded the information to Thomas E. Williams who serves at General Counsel to Butler Snow.

14. Mr. Williams, in turn, contacted Mr. Dye, who was responsible for handling Butler Snow's representation of Ford in the warranty cases in Mississippi. At the time, however, Mr. Dye was getting ready to travel out of town on business to the west coast and told Mr. Williams that they would have to follow-up their discussion when he returned.

15. Mr. Williams also contacted Ms. Malone and Mr. Welborn and was told that the <u>Garland</u> matter had been pending for some time, that it was set for trial beginning February 10, 2015, and that, in their opinion, Mr. Garland would be prejudiced if the Walker Tipps lawyers had to be replaced by substitute counsel. Based on that information, Mr. Williams concluded that it would be appropriate to follow one of three courses of action: (1) obtain informed consent from both Mr. Garland and Ford so that the lawyers in the <u>Garland</u> case could continue with that representation at Butler Snow; (2) failing that, obtain Ford's consent for Butler Snow to withdraw from the Mississippi cases; or (3) failing both, make arrangement for the Walker Tipps lawyers to try <u>Garland</u>

4

before moving to Butler Snow.

16. As noted, Mr. Dye first learned of the possible conflict on January 9, 2015. That was after he had negotiated the annual flat fee for Butler Snow's handling of Ford's Mississippi consumer litigation work in 2015.

17. After unsuccessfully trying to telephone a contact at Ford on January 20, 2015, Mr. Dye sent an email to "WAIVERS@ford.com." In the email dated January 21, 2015, he wrote that he was making a "very, very unique conflict waiver request," which arose from the fact that Walker Tipps was joining Butler Snow and that Walker Tipps currently had "a commercial matter in Tennessee adverse to Ford." (Docket No. 104 at 9). He observed that Butler Snow only "handles consumer/warranty/Lemon Law litigation for Ford in Mississippi"; that no other work was done for Ford by Butler Snow; and that he could "state with absolute confidence that this matter being handled by the Walker, Tipps & Malone firm will have no impact on our work for Ford in Mississippi, nor will our work for Ford in Mississippi have any impact on that case." Id. Mr. Dye requested that someone call him "as soon as possible and prior to this request being evaluated." Id.

18. Mr. Dye received an email response that same day indicating that Alison Nelson, Managing Counsel in the Office of General Counsel at Ford, would be handling the request for a waiver. For many years, Ms. Nelson was Mr. Dye's primary contact at Ford, and he negotiated with her the flat fee retainers for Butler Snow each year. In August 2014, Ms. Nelson stopped overseeing consumer cases and became responsible for providing oversight on dealer matters, premises matters, and some insurance issues.[2] All of those matters fall within the general litigation

---

[2] Ms. Nelson's prior role was taken over by Kiana Barfield and it was with Ms. Barfield that Mr. Dye negotiated the 2015 retainer.

group at Ford.

19. On January 21, 2015, Butler Snow held a meeting during which the partners approved Walker Tipps attorneys joining Butler Snow. Offer letters were thereafter sent to the lawyers at Walker Tipps.

20. On January 22, 2015, Mr. Dye and Ms. Nelson spoke by telephone. Prior to that conversation, Ms. Nelson spoke with other lawyers in Ford's general litigation group. A consensus was reached that a waiver should not be granted because Butler Snow was considering adding lawyers who were suing Ford yet Butler Snow had been Ford's Mississippi lawyers for many years.

21. The parties' recollections of the January 22, 2015 telephone conversation vary somewhat. Having had the opportunity to assess the credibility and demeanor of both Mr. Dye and Ms. Nelson at the evidentiary hearing, the Court finds both were forthright in their testimony, neither was attempting to be deceptive, and they recall the conversation and its import differently. Essentially, and as is not uncommon, each heard just what they wanted to hear.

22. Ms. Nelson claims she told Mr. Dye that Ford was of the view that hiring the Walker Tipps lawyers involved in the <u>Garland</u> case would pose a direct conflict, that Ford lawyers should not be taking positions that were adverse to it, and that Ford would likely not waive the conflict. During this conversation or a following one, she stated that Ford had enjoyed working with him over the years and that Ford would like to continue the relationship but that it was not presented with a real option.[3] She also pointed out that Butler Snow's representation was not limited to consumer matters because it had handled dealers matters in the past, including the matter that Mr. Abernathy

---

[3] At the evidentiary hearing, Ms. Nelson testified that Mr. Dye indicated that Butler Snow had made a business decision to move forward with the merger and Ford was essentially presented with an ultimatum – either execute the waiver or Butler Snow would no longer represent Ford.

was then handling. She testified that she never told Mr. Dye that Ford would not seek to disqualify the Walker Tipps lawyers from the Garland case if they joined Butler Snow. Her recollection was that the conversation ended with the agreement that Mr. Dye would go back and talk with Mr. Abernathy about the cases that he had handled for Ford.

23. Mr. Dye recalls that Ms. Nelson's initial impression was that Ford would not likely waive the conflict. He explained that the Walker Tipps lawyers were not in a position to withdraw from the Garland case because it had been pending for several years and was set to go to trial shortly. He also explained that, because those attorneys would be joining Butler Snow, the firm would have to withdraw from representing Ford if Ford would not agree to the waiver. Mr. Dye asserts Ms. Nelson stated that Butler Snow and Ford might well "have to part ways." According to Mr. Dye, at no point did Ms. Nelson express any objection to Butler Snow withdrawing from its representation, nor was there any suggestion that Ford would seek to disqualify Mr. Garland's lawyer from continuing to represent him once the lawyers from Walker Tipps joined Butler Snow.

24. On February 2, 2015, Mr. Dye emailed Ms. Nelson a revised conflict waiver request which included the Watson Quality Ford case that had been omitted from the original waiver request. In an accompanying email, Mr. Dye recognized Ford's position that it was not inclined to grant a waiver, but asked that it be reconsidered because Butler Snow wanted to continue working for Ford in Mississippi and he did not believe that the Garland matter would affect that representation. He also pointed out that the lawyers from Walker Tipps would be joining Butler Snow the following Monday, February 9, 2015.

25. Mr. Dye and Ms. Nelson spoke again on either February 3 or 4, 2015. During that conversation Ms. Nelson stated that Ford would not waive the conflict to which, at least according

7

to Mr. Dye, he responded that Butler Snow would therefore be withdrawing from the Ford cases that it was then handling. He claims the conversation was cordial and that the two spoke about how best to transition the Ford cases to new counsel, as no trial dates were set and no urgent matters were pending in those cases. He claims that, once again, Ms. Nelson never objected to Butler Snow withdrawing from its representation of Ford, nor did she suggest that Ford would seek to disqualify Butler Snow once the lawyers from Walker Tipps joined the firm.

26. On February 10, 2015, Mr. Dye emailed Ms. Nelson to inform her that the plaintiff in one of the Mississippi cases had declined to file a notice of appeal from the grant of summary judgment. In response, Ms. Nelson wrote that she had read an announcement that Walker Tipps had joined Butler Snow, and asked what Butler Snow's plans were with respect to <u>Garland</u> because Ford did not intend to waive the conflict issue. Mr. Dye responded that, in accordance with their last telephone conversation, Butler Snow would withdraw from the Ford cases in Mississippi once substitute counsel had been secured. Although she never adequately explained at the hearing before this Court why Butler Snow would do both, Ms. Nelson testified that she thought the firm would withdraw not only from the Mississippi case, but also from <u>Garland</u>.

27. On February 13, 2015, Mr. Dye emailed Ms. Barfield regarding the 2015 retainer. In that email he explained that Butler Snow did not expect Ford to pay the $10,000 bonus, but that it did expect Ford to pay the amount due on the monthly retainer until substitute counsel appeared in the Mississippi cases.

28. That same day, Butler Snow learned that Ford intended to file a motion to disqualify Butler Snow from the Garland case. Indeed, Ford filed that Motion on February 13, 2015. The following week Butler Snow filed its Motions to Withdraw in the Mississippi cases.

8

29. Butler Snow has implemented an ethical screening wall whereby the lawyers in Nashville who are representing Mr. Garland cannot access any of the other Ford files and the lawyers in Mississippi who have represented Ford have no ability to access Garland. Moreover, the Garland lawyers and the Mississippi lawyers who have represented Ford have been counseled not to have any substantive conversations related to Ford's representation or to divulge any information gleaned from that representation.

30. At some point after the Motion to Disqualify was filed, Ford's lawyers asked Butler Snow to withdraw from Garland, but that request was declined.

## II. APPLICATION OF LAW

"Pursuant to Local Rule 83.01(e)(4), attorneys appearing before courts in this District are held to the standards set forth in the Tennessee Code of Professional Responsibility" ("Rules") or ("TCPR"). Melville Capital, LLC v. Tenn. Commerce Bank, 2011 WL 6888526, at *2 (M.D. Tenn. Dec. 29, 2011). Those "'Rules are mandatory in character [and] state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action.'" Clinard v. Blackwood, 46 S.W.3d 177, 182-83 (Tenn. 2001) (citation omitted). In fact, under this Court's local rules, "[a] violation of any of the disciplinary rules contained in the Code in connection with any matter pending before this Court shall subject the offending attorney to appropriate disciplinary action." L.R. 83.01(3)(4).

Two TCPR rules are primarily at issue in this case – Rule 1.7, which deals with concurrent representation, and Rule 1.9, which deals with lawyers' duties to former clients.

So far as relevant, Rule 1.7 reads:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of

9

interest exists if:

> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
>
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>
> > (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; [and]
> >
> > (4) each affected client gives informed consent, confirmed in writing.

TCPR 1.7. Rule 1.9 provides in pertinent part:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

TCPR 1.9(a). With regard to both Rules, TCPR Rule 1.10 imputes liability to members of a firm such that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so[.]" Id. 1.10(a).

In this case, Butler Snow asks the Court to analyze the potential conflict pursuant to TCPR 1.9. Butler Snow argues that application of this rule is appropriate because it repeatedly told Ford that it would withdraw from representing Ford in the Mississippi cases if Ford would not agree to waive any conflict, and Ford voiced no objection in response until after the lawyers from Walker Tipps joined Butler Snow. Additionally, once those lawyers joined the firm, Butler Snow filed motions to withdraw in all of the Mississippi cases.

10

If the Court applies Rule 1.9, Butler Snow argues, no conflict exists because the Garland matter in this Court is not "substantially related" to the work it did for Ford in Mississippi, and Ford has not shown otherwise. Butler Snow's prior work was almost exclusively in relation to consumer warranty cases whereas this case involves a dealership dispute.

Butler Snow's invocation of Rule 1.9 is understandable since a "more lenient standard [applies] to successive representation." Filippi v. Elmont Union Free Dist. Bd. of Ed., 722 F. Supp. 2d 295, 305 n.2 (E.D.N.Y. 2010). However, "courts universally hold that a law firm will not be allowed to drop a client in order to resolve a direct conflict of interest, thereby turning a present client into a former client." El Camino Res., Ltd. v. Huntington Nat'l Bank, 623 F. Supp.2d 863, 868 (W.D. Mich. 2007) (collecting cases). This is commonly referred to as the "hot potato" doctrine or rule. See, Metro. Life Ins. Co. v. Guardian Life Ins. Co., 2009 WL 1439717, at *3 (N.D. Ill. May 18, 2009) (the doctrine prohibits and attorney from dropping a client "like a 'hot potato' when the more lucrative client [comes] along"); Santacroce v. Neff, 134 F. Supp.2d 366, 367 (D.N.J. 2001) ("The 'Hot Potato Doctrine' has evolved to prevent attorneys from dropping one client like a 'hot potato' to avoid a conflict with another, more remunerative client.").

"Pursuant to this universal rule, the status of the attorney/client relationship is assessed at the time the conflict arises, not at the time the motion to disqualify is presented to the court," for "'[i]f this were not the case, the challenged attorney could always convert a present client into a former client by choosing when to cease to represent the disfavored client." El Camino Res., 623 F. Supp.2d at 868 (quoting, Unified Sewerage Agency of Washington Co. Ore. v. Jelco, 646 F.2d 1339, 1345 n. 4 (9th Cir. 1981)). Thus, "[a]n attorney 'cannot avoid the . . . disqualification rule applicable to concurrent representation by unilaterally converting a present client into a former client

11

prior to the hearing on the motion for disqualification.'" Kruzfeldt Ranch, LLC v. Pinnacle Bank, 272 F.3d 635, 641 (Mont. 2012) (quoting State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co., 86 Cal. Rptr.2d 20 (1999)).

In this case, even though Butler Snow had access to Walker Tipps' client information on December 5, 2014 and even though it knew of the conflict as of January 9, 2015, it continued to represent Ford in five active matters in Mississippi when Walker Tipps joined the firm on February 9, 2015. In fact, Butler Snow did not file its motions to withdraw in those cases until some eight days later, and only after Ford had filed its Motion to Disqualify. Further, as of the date of the hearing before this Court (and maybe even to this day) the motions to withdraw in most of the cases remained pending, one had been dismissed without prejudice by the Mississippi Supreme Court and another was objected to by the plaintiff in the underlying case. Given this scenario, Butler Snow represented both Ford and Mr. Garland at the same time in matters that were adverse. In doing so, Butler Snow violated Rule 1.7.

Butler Snow's actions cannot be excused as mere indavertence or oversight. At a minimum, it knew full well that Ford had indicated that it was unlikely to consent to a waiver of the conflict and, in fact, knew that it did not have written consent from Ford. Nevertheless it chose to go forward with the merger, bringing on lawyers who were actively suing Ford when Ford was a Butler Snow client.

The violation of Rule 1.7 is clear. What is not so clear is whether disqualification is the appropriate remedy.

Some court have concluded that, upon finding of a violation of the concurrent representation rule, disqualification is automatic. Kruzfeldt Ranch, LLC, 272 P.3d at 645 ("The hardship to [the]

existing client is most regrettable, particularly since it could have been avoided" but, "once it is determined that Rule 1.7 applies, the Rules do not contemplate a balancing of hardships"); Rodriguez v. West Publishing Corp., 563 F.3d 948, 967-68 (9th Cir. 2009) (citation omitted) ("'[s]imultaneous representation of clients with conflicting interests (and without written informed consent) is an automatic ethics violation in California and grounds for disqualification'"). Others, relying primarily on Comment 5 to Model Rule 1.7, have indicated that disqualification is not required, at least where the conflict is "unforeseeable" or "thrust upon" the attorneys. Commonwealth Scientific & Indus. Research Org. v. Toshiba Am. Info. Sys., Inc., 297 F. App'x 970, 974 (Fed. Cir. 2008) (citation omitted) ("Comment 5 recognizes the 'thrust upon' exception to what is colloquially termed the 'hot potato' gambit" which "'applies when . . . unforeseeable developments cause two concurrent clients to become directly adverse'"); Regents of Univ. of Neb. v. BASF Corp., 2006 WL 2385363, at *10-11 (D. Neb. Aug. 17, 2006) (denying motion to disqualify where conflicting representation was due to "an unforeseeable development"). Still others have found no absolute rule requiring disqualification because of concurrent representation. GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C., 618 F.3d 204, 210 (2nd Cir. 2010) (citation omitted) (an "established ground for disqualification is concurrent representation" which is "*prima facie* improper," but it is conceivable that an attorney can carry the heavy burden of "'showing, at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation'"); Cliffs Sales Co. v. Am. S.S. Co., 2007 WL 2907323, at *5 (N.D. Ohio Oct. 4, 2007) ("While some courts have adopted a *per se* rule requiring disqualification of counsel based on concurrent representation, this Court is persuaded that the better approach is to examine the factual situation to determine if disqualification is necessary").

Butler Snow's present predicament was not due to unforeseen circumstances, nor was it thrust upon it by circumstances outside of its control. See, Flying J Inc. v. TA Operating Corp. 2008 WL 648545, at *5 (D. Utah Mar. 10, 2008) ("in most of the cases applying the 'thrust upon' doctrine, the conflict was created, not by any conduct of the law firm, but by events such as corporate mergers and acquisitions"or where "'realignment of parties in litigation[] might create conflicts in the midst of a representation'"). Rather, it made a knowing choice. As a consequence, the Court could simply follow what appears to be the majority approach and deem Butler Snow automatically disqualified from representing Mr. Garland in this case.

Nevertheless, and considering all of the circumstances, the Court declines to follow what may be the norm and will not disqualify Butler Snow from representing Mr. Garland. See, Boston Scientific Corp. v. Johnson & Johnson, Inc., 647 F. Supp.2d 369, 374 & n.7 (D. Del. 2009) (recognizing authority which holds that a violation of Rule 1.7 requires disqualification but finding that inappropriate where the concurrent representations were in unrelated matters, done out of different offices in different cities with an ethical wall in place, and where failure to comply was at least in part due to client's conduct). The Court chooses this path notwithstanding the fact that "'[t]he lawyer who would sue his own client, asserting in justification the lack of substantial relationship between the litigation and the work he has undertaken to perform for that client, is leaning on a slender reed indeed.'" GSI Commerce Solutions, 618 F.3d at 210 (quoting Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d 1384, 1387 (2nd Cir. 1976)).

As previously noted, this Court's local rules mandate appropriate disciplinary action for violations of the TCPR. However, the key word is "appropriate" and a formal rebuke or admonition may suffice, especially when complaints can be made elsewhere if necessary. See Dunavant v. Frito

14

Lay, 2013 WL 816673, at *5 (M.D. Tenn. Mar. 5, 2013) (declining to impose requested action under L.R. 83.01 and noting that sometimes "complaints are best addressed by the Tennessee Board of Responsibility"); Clinard, 46 S.W.3d at 182 (stating that the Tennessee Supreme Court "occupies a unique position to administer the ethical conduct of Tennessee attorneys"). Disqualification, on the other hand, is a severe penalty and one that is not warranted in this case.

The decision of whether to disqualify counsel is a matter of discretion. Grain v. Trinity Health, 431 F. App'x 434, 447 (6th Cir. 2011); Moses v. Sterling Commerce (Am.), Inc., 122 F. App'x 177, 183 (6th Cir. 2005). In fact, the Sixth Circuit has indicated that the standard "is a 'generous one'" and that "[t]he district court is to be given 'wide latitude' in making such determinations," such that its "decision will be upheld unless 'arbitrary' or 'without adequate reasons.'" United States v. Swafford, 512 F.3d 833, 839 (6th Cir. 2008) (citation omitted). It has been suggested that "a District Court deciding a disqualification motion 'should consider the ends that the [applicable] disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions.'" De La Cruz v. Virgin Islands Water and Power Auth., 2014 WL 7398889, at *4 (3rd Cir. Dec. 30, 2014); see also, In re Dell Inc., 498 F. App'x 40, 43 (Fed. Cir. 2012) (indicating that in determining whether to disqualify for violation of a disciplinary rule, court should "balance ethical concerns and right to select counsel of choice"); In re ProEducation Int'l, Inc., 587 F.3d 296, 300 (5th Cir. 2009) (citation omitted) (stating that "Fifth Circuit's approach to ethical issues has remained 'sensitive to preventing conflicts of interest'" but that "'[d]epriving a party of the right to be represented by the attorney of his or her choice is a penalty that must not be imposed without careful consideration'").

The duty of loyalty to a client and the protection of client confidences are matters of paramount importance. If the Garland case was a consumer matter or if it was made clear to Butler Snow that Ford was not inclined to amicably part ways, the Court would likely stop the inquiry and disqualify counsel. However, the Court does not believe that Butler Snow's intention was to game the system or drop Ford like a "hot potato," even though that may have been the net result. Nor does the Court believe that confidential information garnered from Butler Snow's prior representation of Ford on entirely unrelated matters will be shared with those not entitled to it, given the ethical wall which has been erected and the representations made by counsel.

On the other hand, disqualifying counsel at this late date would pose an undue hardship on Mr. Garland, an innocent in this matter who should not be subjected to such a draconian sanction. This case has been pending for more than two years, discovery has been completed, cross motions for summary judgment have been denied, and trial was set to comment within weeks of the Motion to Disqualify being filed. Although the Court is not privy to the figures, it has no doubt that Mr. Garland has spent a significant amount of money prosecuting this action and bringing new counsel up to speed will involve additional and substantial expense.

While Ford claims prejudice because it will have to hire and educate new counsel in the Mississippi litigation, that harm pales in comparison to that faced by Mr. Garland. Because the relationship between Ford and Butler Snow was governed by a yearly retainer contract, Ford has always faced the prospect of the relationship being terminated at the end of any year, either by its choice or Butler Snow's. Regardless, it appears beyond cavil that the relationship between Butler Snow and Ford has been irrevocably damaged such that Ford will have to engage new counsel whether Butler Snow is removed from this case or not.

## III. CONCLUSION

On the basis of the foregoing, the Court will exercise is discretion and deny Ford's Motion to Disqualify. Although it goes without saying that every holding is cabined by the facts presented, it bears emphasizing that the result in this case is particularly fact driven, and that in most cases concurrent representation in violation of Rule 1.7 will result in disqualification.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE